## Waterman *versus* Brown.

| 31 | 161 |
|----|-----|
| 131 | 195 |

| 31 | 161 |
|----|-----|
| 203 | ²573 |

| 31 | 16 |
|----|-----|
| 219 | ³55 |

A court of equity will not, after the lapse of many years, grant relief against a written contract, on slight evidence, which is contradicted by the defendant's answer.

Where a.party assigned certain shares of bank stock, as collateral security for the payment of a promissory note, with authority to sell in case of non-payment; the assignor's equity of redemption is barred at the end of six years from the maturity of the note, the stock being then of less value than the debt, and the assignee having treated it as his own, instead of selling.

A court of equity will not grant relief in such case, after a lapse of eleven years, the stock having risen in value after the assignee's right on his note, was barred by the Statute of Limitations.

APPEAL IN EQUITY from the Court of *Nisi Prius.*

This was a suit in equity, by Edward Waterman against Joseph Brown.    The bill set forth that about the middle of May 1841, the defendant loaned to the complainant $6000, and took from him a promissory note at six months for $6932.10, the difference being made up by usurious interest; and that, at the same time, complainant transferred to defendant 300 shares of the stock of the Mechanics' and Manufacturers' Bank of Trenton, as collateral security.    The bill then averred that the dividends received on the stock had paid the debt, and prayed for an account and re-transfer of the stock, and for general relief.

The answer admitted the loan and transfer of the shares of bank stock as collateral security, but averred : 1. That the loan was originally made on the 19th April 1839.    2. That the sum loaned was $6932.10; and that only lawful interest of six per cent. was charged or received for said loan.    3. That accompanying the power to transfer, and as a part of the security for the loan, was the following memorandum of agreement, viz. :—

"Philadelphia, April 19, 1839.

"I hereby authorize Mr. J. Brown to sell the three hundred shares of Mechanics' and Manufacturers' Bank stock, for the best price it will bring, to reimburse himself, in case I do not promptly pay, at maturity, my note in his favour, dated this day, at six months, for $6932.10, due October 19–22, 1839.

"E. WATERMAN."

The answer further averred that the note was several times renewed, and that it finally came due November 1840; and that then defendant "sold or took said shares at their market price for the same," and "gave up to complainant his said promissory note for $6932.10, as a final and full settlement of this transaction between complainant and defendant." An account was annexed, showing that the stock had failed to pay the entire debt due the defendant, and that a balance remained unpaid of $2234.79. The answer set up that the transactions were "fully ended and closed between them more than six years before the day and time of filing complainant's bill; and that, from the notorious insolvency of complainant, defendant was deterred from suing him at law; to recover the balance yet due from complainant to him upon final settlement."

To this answer the general replication was filed; and, the original defendant having died in August 1852, the suit was revived against his administrators.

The proof was in part furnished by the books of account of Joseph Brown, which contained the entries of the note as originally given April 19, 1839, at six months, and successively renewed for periods of six months, Oct. 22, 1839, May 9, 1840, and Nov. 12, 1840, *and falling due for the last time May* 15, 1841. The interest in some instances appeared to have been one per cent. a month. The memorandum, authorizing sale of stock, was put in evidence, also several letters and memorandums from complainant to defendant subsequent to May 15, 1841, and from which, in part, it was argued for defendant, it was evident, that complainant treated this as a transaction for ever ended. It was shown that the stock, when transferred, had had paid upon it only $25 per share; and that soon after, the legislature reduced the par to $20 per share, and that five further instalments of five dollars per share each, had been paid by defendant since it was transferred to him. That the present par value of the shares is $45, and that there have been sales both below and above $50 per share. There was no evidence of its market value at the time defendant claimed to have closed the transaction, by taking the stock, and giving up to complainant the note; but it was in evidence that at that time only $25 per share had been paid on it, and that soon after, the legislature reduced the par to $20 per share. Defendant took the stock himself, at $17 per share, claiming, in his account, that it was the market price at that time.

The Master reported that, the authority given by complainant to Brown was an authority to sell, and did not authorize Brown to take the stock himself, at the market rate. That there was not sufficient evidence to sustain the allegation of the answer, that the transaction had been closed by taking the stock and giving up

[Waterman v. Brown.]

the note, and therefore there was no time from which the statute appeared to have begun to run. He stated an account, charging complainant with the original loan, and with the subsequent instalments paid by Brown on the stock, and crediting him with all the dividends upon the stock, and with the value of the stock at $50 per share, resulting, as he states the account, in a balance due complainant of $3409. The learned judge (KNOX, J.) who reviewed the Master's opinion, upon exceptions filed, overruled the exceptions, saying, "after considerable hesitation, I have come to the conclusion that the report of the master is correct."

From this decree the present appeal was taken by the defendants.

*Cuyler*, for the appellants.

*Tschudy* and *H. M. Phillips*, for the appellees.

The opinion of the court was delivered by

LOWRIE, C. J.—The defendant denies positively that there was any usury in the transaction, and we are quite dissatisfied with the evidence on which this denial was set aside. It proves payments made by the defendant to the plaintiff; but against his denial on oath, it does not prove that those were the only payments. What was paid by checks appears, and we are simply without proof that the rest was paid: and this is not strange, considering that the trial took place after the defendant's death, and fourteen years after the transaction.

Moreover, there was too much value attributed to the entries in the defendant's books as evidence. They were his own private memorandums, made for his own purposes, and liable to be altered at his pleasure, and they were in no proper sense admissions: 28 *State R.* 504. So far as they show his payments to the plaintiff, they seem to be elements of his account with his banker, rather than with the plaintiff; and therefore payments made in his business, not by checks, would properly be left out, and of course we cannot regard such entries as contradicting the defendant's denial of usury. Such slight evidence as this for setting aside the written contracts of parties, after such inexcusable delay, most certainly ought not to prevail.

But the fundamental question of this cause is yet before us; and to get hold of it rightly we must go back to the time of the transaction in 1839, and receive the light which the then existing circumstances give us.

The defendant lent to the plaintiff $6932 on his promissory note, to be paid in October 1839; and as security therefor the plaintiff made an absolute assignment to the defendant of three hundred shares of bank stock, and at the same time gave him a written

authority to sell the stock to pay the note at its maturity, if the plaintiff should fail to pay it.   By substituted notes the loan was continued till May 15, 1841, and was not then paid; no new note was given; and for eleven years afterwards no more is heard of the matter.   Why?

The answer is plain on the evidence.   The stock was then estimated as not worth more than twenty dollars a share, as appears by an act of the legislature of the state where the bank is situated, and we presume this to be well founded.   That it was not worth more appears farther by the dividends, which for seven years after 1839 averaged less than 6 per cent. on twenty dollars.   That it was not equal to the debt appears by the fact, that during part of the time additional security was given for the debt.   It is quite manifest that, for seven years after the loan was made, the debt due by the defendant had continued to increase until it amounted to about $7400, if it was still subsisting, and there was no other security for it but the stock, then apparently worth less than $6000, for the plaintiff was insolvent; and the next year the debt was barred by the statute of limitations, and it is not till five years afterwards that this claim is made.

Now, though the plaintiff might have sold the stock at the maturity of the last note, yet surely it was very natural for him to infer, from its inadequacy and the plaintiff's neglect to provide for the payment of the loan, and from his hopeless insolvency, that it was abandoned to him.   He might consider these circumstances, in connection with the fact that the title was in his own name, as equivalent to a transfer to him absolutely; and that the empty form of sale was waived, for the law does not require vain things. This was doing more than justice to the plaintiff, for it was paying his debt by less than its amount, and he would then have gladly consented to it.   When he ought to have redeemed, and for many years afterwards, redemption would have been worthless to him, and he could have no intention to do it.   It was a new intention, after a change of eleven years' growth, that waked him up to this action.

We should administer equity very badly if we should allow the plaintiff to treat the stock as the defendant's for so long a period, and the debt as paid by it, and then to claim the benefit of a rise in value occasioned by no merit of his.   For thirteen years the legal title of the stock was in the defendant, and the plaintiff had nothing but an equity: and to prove that, he depended entirely on the defendant's admissions and papers.   When the defendant's claim was barred, the plaintiff's equity was worthless, for the stock would not have paid the debt.   If the stock had fallen in value after the maturity of the last note, the defendant alone would have been the loser; and there can be no equity in a remedy which would favour only the delinquent party.

[Waterman *v.* Brown.]

Certainly the plaintiff had a right of action as soon as the debt was due; for then he might have paid the debt and demanded the stock, and the limitation of the statute is not usually to be extended by the negligence of the party who claims to be excused from it: 25 *State R.* 154; 24 *Id.* 52; 20 *Id.* 302. A debt is not saved from it because made payable on demand. It is often said that, where a demand is necessary to the right of action, the statute does not begin to run till the demand is made. But this almost sets aside the statute in such cases, and hence it is decided, that a demand will be presumed to have been made in a reasonable time: 18 *State R.* 23; 1 *Taunt.* 372: and the rule is often directly pre-termitted: 1 *Watts* 275; 4 *State R.* 58; 6 *Id.* 51; 15 *Wend.* 302; 1 *Rand.* 284; 5 *Cowen* 376: and such is the wording of the statute.

The statute runs in favour of a mortgagee in possession, and also against a mere equitable title to land and in favour of the legal title; 18 *State R.* 283: and these are very direct analogies in favour of applying it here. We have no hesitation in saying, and especially under the circumstances of this case, that the plaintiff's equity was barred by the delay of six years after his debt fell due, without suit brought, or any mutual acts to keep it alive.

Decree reversed, and the bill is dismissed at the plaintiff's costs.